No. 26-3617

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellant

v.

CITY OF CLEVELAND, OH,
Defendant-Appellee

LISA SCHIAVO BLATT; ERIN MARIE SIELAFF,
Amicae Curiae

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

# BRIEF FOR THE UNITED STATES AS APPELLANT

HARMEET K. DHILLON
Assistant Attorney General

R. JONAS GEISSLER
Deputy Assistant Attorney General

ANDREW G. BRANIFF
MEREDITH L. BAKER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 532-3803

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

The United States requests oral argument. This appeal raises important issues regarding the termination of consent decrees under Federal Rule of Civil Procedure 60(b)(5). Oral argument likely would assist the Court in understanding the record and resolving the issues presented.

## TABLE OF CONTENTS

**PAGE**

STATEMENT IN SUPPORT OF ORAL ARGUMENT

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 2

STATEMENT OF ISSUES .......... 3

STATEMENT OF THE CASE .......... 3

SUMMARY OF THE ARGUMENT .......... 11

STANDARD OF REVIEW .......... 12

ARGUMENT

I. The parties' agreement that the conditions underpinning the Consent Decree are resolved and to terminate the Consent Decree makes continued enforcement inequitable. .......... 13

II. The City's achievement of a durable remedy of all constitutional violations renders continued enforcement inequitable. .......... 21

A. The district court applied the wrong standard to the parties' Rule 60(b)(5) motion. .......... 21

B. The City has implemented a durable remedy to any pattern or practice of excessive force. .......... 29

C. The City has implemented a durable remedy to any pattern or practice of unreasonable searches and seizures. .......... 34

**TABLE OF CONTENTS (continued): PAGE**

D. The City's progress as to the Consent Decree's remaining provisions supports termination. ............... 42

CONCLUSION ........................................................................... 49

CERTIFICATE OF COMPLIANCE

ADDENDUM – DESIGNATION OF RELEVELANT RECORD ITEMS

**TABLE OF AUTHORITIES**

**CASES:** **PAGE**


*Agostini v. Felton*, 521 U.S. 203 (1997) .......... 13

*Barnes v. Felix*, 605 U.S. 73 (2025) .......... 33

*Burcica v. Ludy*, 260 N.E.3d 652 (Ohio Ct. App. 2024), *appeal not accepted for review*, 257 N.E.3d 189 (Ohio 2025) .......... 14

*City of Canton v. Harris*, 489 U.S. 378 (1989) .......... 32

*Cleveland Firefighters for Fair Hiring Pracs. v. City of Cleveland*, 669 F.3d 737 (6th Cir. 2012) .......... 16

*County of Los Angeles v. Mendez*, 581 U.S. 420 (2017) .......... 33

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004) .......... *passim*

*Graham v. Connor*, 490 U.S. 386 (1989) .......... 29

*Horne v. Flores*, 557 U.S. 433 (2009) .......... *passim*

*In re Ferro Corp. Derivative Litig.*, 511 F.3d 611 (6th Cir. 2008) .......... 12

*John B. v. Emkes*, 710 F.3d 394 (6th Cir. 2013) .......... *passim*

*Johnson v. Heffron*, 88 F.3d 404 (6th Cir. 1996) .......... 19

*Little v. City of Owensboro*, No. 25-5078, 2026 WL 1865439 (6th Cir. June 29, 2026) .......... 29

*Milliken v. Bradley*, 433 U.S. 267 (1977) .......... 21

*Northeast Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012) .......... 24

**CASES (continued):** **PAGE**

*Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606 (6th Cir. 2011) .......... 22-24

*Peery v. City of Miami*, 977 F.3d 1061 (11th Cir. 2020) .......... 31, 40

*Phelps v. Logan Nat. Gas & Fuel Co.*, 128 N.E. 58 (Ohio 1920) .......... 14

*Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992) .......... *passim*

*United States v. Michigan*, 18 F.3d 348 (6th Cir. 1994) .......... 16

*United States v. Sineneng-Smith*, 590 U.S. 371 (2020) .......... 15

*United States v. Tennessee*, 615 F.3d 646 (6th Cir. 2010) .......... 12-13

*United States v. Tennessee*, 986 F. Supp. 2d 921 (W.D. Tenn. 2012) .......... 24

*United States v. Texas*, 599 U.S. 670 (2023) .......... 20

*Vogel v. City of Cincinnati*, 959 F.2d 594 (6th Cir. 1992) .......... 14

*Wesley Corp. v. Zoom T.V. Prods.*, 749 F. App'x 449 (6th Cir. Jan. 2019) .......... 13-14

**STATUTES:**

20 U.S.C. 1703(f) .......... 27

28 U.S.C. 1292 .......... 2

28 U.S.C. 1331 .......... 2

28 U.S.C. 1343 .......... 2

28 U.S.C. 1345 .......... 2

**STATUTES (continued):** **PAGE**

34 U.S.C. 12601 (formerly 42 U.S.C. 14141) ................................ 5, 11, 20

**RULE:**

Fed. R. Civ. P. 60(b)(5) ................................................................... *passim*

## INTRODUCTION

Since 2015, the United States and the City of Cleveland have worked toward improving the Cleveland Division of Police's (CDP) policies and practices under the terms of a Consent Decree. That Consent Decree resolved a 2014 finding that the CDP had a pattern or practice of using excessive force and addressed a separate allegation that CDP was executing searches and seizures in violation of the Fourth Amendment. But the Consent Decree took an ambitious track, imposing a spectrum of requirements to make CDP a better, more community-oriented police force.

Eleven years later, CDP no longer has a pattern or practice of using excessive force or executing unconstitutional searches or seizures. It has implemented lasting remedies to its prior practices. And it has made strides across the spectrum of requirements that the Consent Decree imposed.

But the United States and the City remain bound by the Consent Decree's terms and its attendant drain on resources. Both must expend funds to continue monitoring and litigating under the Consent Decree, even beyond the funds the City must spend to ensure continued

constitutional policing. And the 11-year-old Consent Decree constrains the City's ability to respond to new challenges. The United States and the City have agreed that CDP has resolved the issues that animated the Consent Decree and it is time to terminate the decree.

The district court rejected that agreement, denying the parties' Joint Motion to Terminate. In doing so, the court failed to give appropriate weight to the parties' agreement and misapplied both the Supreme Court's and this Court's precedent explaining the standard for terminating institutional reform decrees under Federal Rule of Civil Procedure 60(b)(5). The district court abused its discretion, and this Court should reverse.

## STATEMENT OF JURISDICTION

This is an appeal from the denial of a Joint Motion to Terminate Consent Decree in a civil case. The district court had jurisdiction under 28 U.S.C. 1331, 1343, and 1345. That court entered a final Order denying the Joint Motion on May 8, 2026. Order, R. 708, PageID# 15386-15459. The United States filed a timely Notice of Appeal on July 7, 2026. Notice of Appeal, R. 712, PageID# 15465. This Court has jurisdiction under 28 U.S.C. 1292.

## STATEMENT OF ISSUES

1. Whether the parties' agreement that the issues that gave rise to a consent decree are resolved and that a consent decree should be terminated is a changed circumstance and itself warrants termination under Federal Rule of Civil Procedure 60(b)(5).

2. Whether the district court abused its discretion in denying the parties' Joint Motion to terminate the Consent Decree under Federal Rule of Civil Procedure 60(b)(5).

## STATEMENT OF THE CASE

1. In 2013, "at the request of the Mayor of Cleveland and others," the Department of Justice (DOJ) began investigating whether CDP was "engag[ing] in a pattern or practice of the use of excessive force in violation of the Fourth Amendment of the United States Constitution and the Violent Crime Control and Law Enforcement Act of 1994." Settlement Agreement, R. 7-1, PageID# 373. The DOJ determined "that it had reasonable cause to believe that, although most force used by CDP officers was reasonable, a significant amount of deadly and less lethal force was excessive." *Id.* at PageID# 374. Thus, the DOJ concluded "that it had reasonable cause to believe that CDP engages in a pattern or

practice of using excessive force" and determined that "systemic deficiencies" related to "accountability systems, resource deployment, community policing efforts, policies, and officer support, training, equipment, and supervision" contributed to this "pattern or practice." *Id.* at PageID# 374.The DOJ "did not specifically investigate CDP's search, seizure, and arrest practices" but raised "Fourth Amendment concerns" about those areas, as well. *Id.* at PageID# 374.

The City of Cleveland did not agree with the DOJ's findings but did agree that the "findings raise[d] issues of importance to the City and the community that should be addressed." Consent Decree, R. 7-1, PageID# 374-375. The DOJ and the City began negotiating "a court-enforceable settlement agreement." *Id.* at PageID# 374.

On May 26, 2015, the DOJ filed both a Complaint, R. 1, PageID# 1-7, and a Joint Motion for Entry of Consent Decree, R. 3, PageID# 71-79. The Complaint was based on federal law providing that "[i]t shall be unlawful for any governmental authority . . . to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that

deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States. 34 U.S.C. 12601(a) (formerly 42 U.S.C. 14141); Complaint, R. 1, PageID# 5-6. The district court granted the Motion and entered an Order incorporating the terms of the proposed Settlement Agreement into a Consent Decree. Order Granting Joint Motion for Entry of Consent Decree, R. 7, PageID# 367; *see* Settlement Agreement, R. 7-1, PageID# 368-477.

This Consent Decree is expansive in scope. It imposes requirements in 11 areas: Community Engagement and Building Trust, Community and Problem-Oriented Policing, Bias-Free Policing, Use of Force, Crisis Intervention, Searches and Seizures, Accountability, Transparency and Oversight, Officer Assistance and Support, Supervision, and Policies. Second Modified Settlement Agreement (Consent Decree), R. 502-1, PageID# 11584-11586.[1] Additionally, the Consent Decree contains provisions covering "Implementation, Assessment, Outcomes, and

[1] At the request of the parties, the Court has modified the Consent Decree since originally entered. These modifications are not at issue here. For clarity, this discussion centers on the currently operative Consent Decree, as last modified through a text-only Order issued on March 7, 2024.

Enforcement" that require the parties to "jointly select an Independent Monitor" to assess and report on the City's compliance. *Id.* at PageID# 11666. The City "bear[s] all reasonable fees and costs of the Monitor." *Id.* at PageID# 11668.

Excessive force provided the impetus for the Consent Decree, and the Use of Force Section imposes some of the most thorough and specific requirements. It provides principles for officers to follow (*see* Consent Decree, R. 502-1, PageID# 11599-11600 (requiring, for example, officers to "use de-escalation techniques whenever possible and appropriate" and generally prohibiting, among other things, neck holds, the use of a "firearm as an impact weapon," and "head strikes with hard objects, except where lethal force is justified")), and it provides detailed requirements for reporting and investigating the use of force (Consent Decree, R. 502-1 at PageID# 11607-11620). And the Consent Decree gives some use-of-force investigative responsibility to a Force Investigation Team within Internal Affairs. Consent Decree, R. 502-1 at PageID# 11613-11618. The Decree also requires the City to develop a Force Review Board "to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics,

training, policy, and agency improvement perspective." *Id.* at PageID# 11618.

The Search and Seizure Section likewise requires training, prohibits stops and pat-downs unsupported by the appropriate level of suspicion, and mandates speedy and thorough supervisory review of stops. Consent Decree, R. 502-1, PageID# 11626-11629.

The Crisis Intervention Section requires the City to establish a Mental Health Response Advisory Committee, designate a crisis intervention coordinator, revise its policies, provide training on crisis intervention to every officer, select some officers to receive advanced training, and aggregate and report data on crisis responses. Consent Decree, R. 502-1, PageID# 11620-11626.

The Consent Decree also required the establishment of a Community Police Commission (Commission) with members "represent[ing] the many and diverse communities in Cleveland." Consent Decree, R. 502-1, PageID# 11592. The Commission works with communities to "develop[] recommendations for police practices that reflect an understanding of the values and priorities of Cleveland residents" and "provide[s] transparency on police department reforms"

by "report[ing] to the City and community as a whole." *Id.* at PageID# 11592.

The Policy Section requires CDP to, as needed, "develop, revise, and implement policies and procedures to fully incorporate the terms of [the Consent Decree] and comply with applicable law." Consent Decree, R. 502-1, PageID# 11665. CDP must provide these policies to the Commission for comment and to the DOJ and Monitor for approval, with disagreements to be resolved by the Monitor or by the court. *Id.* at PageID# 11665.

Other provisions of the Consent Decree largely focus on requiring CDP to implement new policies, provide training, track data, and implement timely, unbiased, methodical review processes. *See, e.g.*, Consent Decree, R. 502-1, PageID# 11597, 11630, 11639, 11641-11649, 11654. In some cases, the Consent Decree requires the creation of a new position or otherwise designates requirements and responsibilities of position-holders. *Id.* at PageID# 11644-11645, 11651. And the Consent Decree requires CDP to study its staffing and equipment needs and create corresponding plans. *Id.* at PageID# 11654, 11659-11660. It also

contains provisions making it easier for civilians to file complaints. *Id.* at PageID# 11635-11641.

By its terms, the Consent Decree is to "terminate when the City has been in Substantial and Effective Compliance with the search and seizure provisions for one year and with all of the remaining provisions for two consecutive years," with "Substantial and Effective Compliance" defined to "mean[] that the City either has complied with all material requirements of this Agreement, or has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures." Consent Decree, R. 502-1, PageID# 11683.

2. From September 2025 to February 2026, the Monitor completed seven formal assessments, including for the Use of Force and Search and Seizure sections of the Consent Decree.[2] The Monitor rated the City's

[2] The Consent Decree required the Monitor to complete annual outcome measure assessments, with a comprehensive outcome assessment to take place two and one-half years after the effective date of the Consent Decree, i.e., December 12, 2017. Consent Decree, R. 502-1, PageID# 11670, 11676, 11686; *see* Order Granting Joint Motion for Entry of Consent Decree, R. 7, PageID# 366-367 (entering Consent Decree on June 12, 2015). The City was entitled to dismissal based on either the compliance assessments or the outcome measures. Consent

compliance with the individual paragraphs of the Consent Decree, finding that the City had achieved substantial and effective compliance with some provisions and rating others on a sliding scale from non-compliant to general compliance, a rating just under substantial and effective compliance for provisions with which the City had complied, but not yet for a sustained period. *See* 2025 Search and Seizure Assessment, R. 672-1, PageID# 14652-14653, 14683-14685; 2025 Use of Force Assessment, R. 685, PageID# 14952-14971.

Upon the completion of those assessments—and after 11 years of improvements under the Consent Decree—the United States and the City jointly moved to terminate the decree, arguing that: (1) termination was warranted under the terms of the decree based on the City's compliance; (2) the City had achieved a durable remedy to any constitutional violations, warranting termination under Rule 60(b)(5); and (3) termination was warranted under Rule 60(b)(4). Joint Motion to Terminate Settlement Agreement, R. 688-2, PageID# 15078.

---

Decree, R. 502-1, at PageID# 11683. Multiple prior Monitors did not meet this required schedule.

The district court denied that Motion. Order, R. 708, PageID# 15386-15459. The court focused its attention on whether the City had achieved substantial and effective compliance with each area of the consent decree. *See* Order, R. 708, PageID# 15426-15427, 15429, 15433, 15436, 15439, 15441, 15443-15445, 15451, 15453-15454. Consequently, the court made no findings as to whether there was any ongoing violation of federal law and whether the City's remedy of any federal-law violations was durable.

## SUMMARY OF THE ARGUMENT

The parties agree that the Consent Decree should terminate and there is no existent pattern or practice of constitutional violations on which to base the ongoing exercise of jurisdiction under 34 U.S.C. 12601. This agreement is itself a changed circumstance warranting termination under Federal Rule of Civil Procedure 60(b)(5). When both parties—and particularly when both parties are governments—agree that living under a consent decree is no longer best for the public, a district court should defer to that agreement. The district court here abused its discretion in failing to do so.

But regardless, termination is warranted because the City has achieved a durable remedy to its constitutional violations. There is no ongoing violation of law, and the record shows the City's commitment to continued constitutional policing. The district court erred in failing to make these determinations, instead focusing on whether the City has complied with the broad terms of the Consent Decree. Under *Horne v. Flores*, 557 U.S. 433, 450 (2009), compliance with the decree is not necessary to obtain relief under Federal Rule of Civil Procedure 60(b)(5); it is sufficient to show that there is no ongoing violation of law and the City's remedy is durable. This Court should reverse.

## STANDARD OF REVIEW

This court "review[s] a denial of a Rule 60(b)(5) motion for abuse of discretion." *United States v. Tennessee*, 615 F.3d 646, 652 (6th Cir. 2010). "A court abuses its discretion when it commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *Ibid.* (quoting *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 623 (6th Cir. 2008). Even when "the trial court has discretion," an "exercise of discretion cannot be permitted to stand if . . . it rests upon a legal

principle that can no longer be sustained." *Ibid.* (quoting *Agostini v. Felton*, 521 U.S. 203, 238 (1997)).

## ARGUMENT

### I. The parties' agreement that the conditions underpinning the Consent Decree are resolved and to terminate the Consent Decree makes continued enforcement inequitable.

Federal Rule of Civil Procedure 60(b)(5) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" when "applying [the judgment] prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). This Rule "provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). An agreement between two formerly adverse parties that continued enforcement is no longer equitable is itself "a significant change . . . in factual conditions." *Ibid.* (quoting *Rufo*, 502 U.S. at 384). When both parties agree that prospective application "is no longer equitable," Fed. R. Civ. P. 60(b)(5), a district court should presume that they are correct. *Cf. Wesley Corp. v.*

*Zoom T.V. Prods.*, 749 F. App'x 449, 450 (6th Cir. 2019) (transferring rather than dismissing an appeal based on "[t]he interests of justice" when the appellant had an arguable basis for bringing the appeal in this Court and the parties jointly requested transfer).

A consent decree "is a contract founded on the agreement of the parties." *Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir. 1992); *see Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) ("Consent decrees have elements of both contracts and judicial decrees."). And, ordinarily, contracts can be rescinded by agreement. *Burcica v. Ludy*, 260 N.E.3d 652, 661 (Ohio Ct. App. 2024), *appeal not accepted for review*, 257 N.E.3d 189 (Ohio 2025); *see Phelps v. Logan Nat. Gas & Fuel Co.*, 128 N.E. 58, 59-60 (Ohio 1920) (rejecting a claim by an individual gas consumer and holding that a municipality and gas company could abrogate a gas-rate contract by mutual agreement).[3] Agreements are similarly significant within "our adversarial system of adjudication," which "is designed around the premise that [parties represented by competent counsel]

[3] This Court has applied state contract law in interpreting the provisions of a consent decree. *John B. v. Emkes*, 710 F.3d 394, 407 (6th Cir. 2013).

*know what is best for them*, and are responsible for advancing the facts and argument entitling them to relief." *United States v. Sineneng-Smith*, 590 U.S. 371, 375-376 (2020) (alteration in original; emphasis added; citation omitted). Courts thus should place great weight on the parties' agreement to rescind a consent decree because it is a form of contract.

Similarly, this Court should place great weight on the parties' agreement that the conditions underpinning the Consent Decree are resolved. Below, the United States cites to the record showing the City's achievement of a durable remedy and the inequity of continued enforcement of the Consent Decree. It would be inequitable to penalize the parties for the prior Court Monitor's failure to have completed outcome measure assessments and timely compliance assessments (*see* footnote 2, *supra*) to further support that to which the parties have already agreed—*i.e.*, the constitutional issues with uses of force and allegations of search and seizure violations are resolved. Even the district court did not point to any ongoing excessive force, nor record of unreasonable searches and seizures. Accordingly, the parties' agreement to rescind the consent decree based on that fact carries great weight, too.

This weight should be nearly dispositive when, as here, governmental parties are involved.[4] The Supreme Court has given great weight to state interests even when the plaintiffs do *not* consent to termination under Rule 60(b)(5). *See Horne*, 557 U.S. at 448-450; *see also*

---

[4] In *United States v. Michigan*, this Court concluded that "[o]nce the jurisdiction of the court has been invoked, that court has an obligation to exercise its jurisdiction meaningfully; it may not blindly defer to the stipulation of the parties." 18 F.3d 348, 352 (6th Cir. 1994). *Michigan* does not control here, for multiple reasons. First, *Michigan* was decided prior to *Horne*, and the *Michigan* Court barely addressed Rule 60(b)(5) and did not consider whether the parties' agreement itself was "a significant change . . . in factual conditions." *Horne*, 557 U.S. at 447 (quoting *Rufo*, 502 U.S. at 384); *see Michigan*, 18 F.3d at 352. Second, the *Michigan* Court's brief discussion of Rule 60(b)(5) emphasized that Rule's discretionary nature, but the Supreme Court has since clarified that "[i]f a durable remedy [of the violation] has been implemented, continued enforcement of the [court's] order is not only unnecessary, but improper." *Horne*, 557 U.S. at 450. Third, the *Michigan* Court paid no regard to federalism concerns, but the Supreme Court has since warned that the Rule 60(b)(5) analysis should account for "sensitive federalism concerns," *Horne*, 557 U.S. at 448, 450-451. Further, this Court's post-*Horne* explanation of a district court's discretion in *Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland* does not control here because *Cleveland Firefighters* dealt with a joint motion to *extend* a consent decree that could itself have been unconstitutional, 669 F.3d 737, 741-742 (6th Cir. 2012); the court obviously need not have deferred to the parties' joint motion in that instance. Regardless, as discussed in Part II, *infra*, even if *Michigan* or *Cleveland Firefighters* foreclosed deference to the parties' views, reversal is independently warranted because the district court failed to appropriately consider whether the City has implemented a durable remedy to any violation of federal law.

*Frew*, 540 U.S. at 442 ("'[P]rinciples of federalism and simple common sense require the [district] court to give significant weight' to the views of government officials." (alteration in original) (quoting *Rufo*, 502 U.S. at 392 n.14)).[5] The Supreme Court has held that, in the institutional-reform context, Rule 60(b)(5) calls for "a flexible standard that seeks to return control to state and local officials as soon as a violation of federal law has been remedied." *Horne*, 557 U.S. at 450-451. This flexibility is warranted because "institutional reform injunctions often raise sensitive federalism concerns," which "are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities." *Id.* at 448. Further, Rule 60(b)(5) counteracts the fact that consent decrees are sometimes used to thwart the democratic process, "bind[ing] state and

[5] The Supreme Court stated in *Rufo* that the threshold inquiry of *whether* a significant change warrants modification of a consent decree does not involve deference to local government officials, and that deference only comes into play in determining *how* to modify the decree. 502 U.S. at 392 n.14. But *Rufo* dealt with a *defendant's* Rule 60(b) motion, not a joint motion, and the Court there never decided whether courts should defer to the parties' *joint determination* that continued enforcement is inequitable when considering the threshold inquiry. *See id.* at 376. And, in any case, *Horne* directs courts to pay attention to federalism concerns, separate and apart from any question of deference. *See* 557 U.S. at 451.

local officials to the policy preferences of their predecessors and . . . 'improperly depriv[ing] future officials of their designated legislative and executive powers.'" *Id.* at 449 (quoting *Frew*, 540 U.S. at 441). And "[a]s public servants, the officials of the State must be presumed to have a high degree of competence in deciding how best to discharge their governmental responsibilities." *Frew*, 540 U.S. at 442. City leaders have determined that the Consent Decree impedes innovation, responsiveness, and efficiency such that continued enforcement is not in the City's best interest. *See* Joint Motion to Terminate Settlement Agreement, R. 688-2, PageID# 15121-15122, 15129-15130, 15136, 15142. Federalism and respect for democratic principles require giving weight to these determinations.[6]

[6] Instead of giving weight to these determinations, the district court improperly discounted them. Order, R. 708, PageID# 15422. And the court expressed concern regarding tension between the City and the Cleveland Community Police Commission, which did not support the Joint Motion to Terminate. *Id.* at PageID# 15424-15425. Far from being a reason to deny termination, intragovernmental friction "elevate[s]" federalism concerns, *Horne*, 557 U.S. at 452, making clear that the democratic process is at work and that the court's and United States' continued monitoring is unnecessary.

Furthermore, "[f]unctioning under a consent judgment entails real costs." *Johnson v. Heffron*, 88 F.3d 404, 406 (6th Cir. 1996). "Wanting to avoid [the costs of constant monitoring] . . . should not give rise to suspicion." *Id.* at 407. Here, the City has, in recent years, budgeted more than $2 million a year for monitoring activities under the Consent Decree. Motion to Terminate Settlement Agreement, R. 688-2, PageID# 15135. And that amount does not include expenses the City incurred directly in trying to comply with the Consent Decree's exhaustive provisions—in 2025, the City invested $10 million toward meeting the Consent Decree's terms and institutionalizing needed reforms. *Id.* at PageID# 15135.

These interests weigh in favor of termination. But that weight is doubled where, as here, the United States, as the sovereign plaintiff, *agrees* that continued enforcement is inequitable. Continued enforcement imposes costs not only on the City, but also on the United States. The Department of Justice has limited resources. The continued existence of this Consent Decree requires the continued allocation of attorney time that could be used to protect civil rights in other matters. *Cf. Horne*, 557 U.S. at 448 ("When a federal court orders that money be appropriated for

one program, the effect is often to take funds away from other important programs.").

Furthermore, Congress has given the Attorney General the authority to bring an enforcement action to seek an injunction against "a pattern or practice of conduct . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 34 U.S.C. 12601 (formerly 42 U.S.C. 14141). The Attorney General's enforcement power is explicitly discretionary—he "may" obtain relief, *ibid.*—which is unsurprising "given the Executive's Article II authority to enforce federal law and the deeply rooted history of enforcement discretion in American law." *United States v. Texas*, 599 U.S. 670, 684 (2023). Accordingly, courts should give deference to the Executive's judgment that continued enforcement of a consent decree is neither necessary nor beneficial.

"[T]he longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a [City's] democratic processes." *Horne*, 557 U.S. at 453. Here, it is not just the City's democratic process at risk of improper interference. It is the City's budget, the United States' budget, and the Executive enforcement

authority, which is also accountable to the democratic process. The district court abused its discretion in failing to recognize that the parties' agreement is itself a significant change in circumstances that warrants termination.

## II. The City's achievement of a durable remedy of all constitutional violations renders continued enforcement inequitable.

Regardless of whether the district court owed deference to the parties' agreement that the consent decree must end, the court erred in applying the wrong standard to the parties' Rule 60(b) motion and in refusing to terminate the consent decree. The City has implemented a durable remedy to the constitutional violations and termination is therefore warranted.

### A. The district court applied the wrong standard to the parties' Rule 60(b)(5) motion.

In *Horne v. Flores*, the Supreme Court stated that "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation." 557 U.S. 433, 450 (2009) (alteration in original) (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)). "'If [a federal consent decree is] not limited to reasonable and necessary implementations of

federal law,' it may 'improperly deprive future officials of their designated legislative and executive powers.'" *Ibid.* (alteration in original) (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004)).

In the context of institutional reform decrees, "courts must take a 'flexible approach' to Rule 60(b)(5) motions." *Horne*, 557 U.S. at 450 (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 381 (1992)). And "a critical question in th[e] Rule 60(b)(5) inquiry is whether the objective of the [decree] . . . has been achieved." *Ibid.* In fact, "[i]f a durable remedy has been implemented, continued enforcement of the order is *not only unnecessary, but improper*." *Ibid.* (emphasis added). Thus, courts must "ascertain whether ongoing enforcement of the original order [i]s supported by an ongoing violation of federal law." *Id.* at 454. The goal should be "to return control to state and local officials as soon as a violation of federal law has been remedied." *Id.* at 451.

The district court failed to apply *Horne*'s flexible approach. The court acknowledged that flexibility is required but stated that "modification of a consent decree is an extraordinary remedy that should not be undertaken lightly." Order, R. 708, PageID# 15407 (quoting *Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 614 (6th

Cir. 2011)). And the court looked to *Rufo*, rather than *Horne*, for the applicable standard, holding that "a party seeking to modify a consent decree under Rule 60(b)(5) first 'bears the burden of establishing that a significant change in circumstances warrants revision of the decree'" and that the court should then "consider whether the proposed modification is suitably tailored to the changed circumstance.'" *Id.* at PageID# 15406 (quoting *Rufo*, 502 U.S. at 383-384). The court stated that "[a] significant change in factual conditions may warrant modification of a consent decree when the conditions make compliance with the decree: (1) 'substantially more onerous[;]' (2) 'unworkable because of unforeseen obstacles[;]' or (3) 'when enforcement of the decree without modification would be detrimental to the public interest.'" *Id.* at PageID# 15419 (second and third brackets in original) (quoting *Rufo*, 502 U.S. at 384). The district court further held that because the City's remedial accomplishments were anticipated at the time of entering the Consent Decree, "the City b[ore] a 'heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b).'" *Id.* at PageID# 15422 (quoting *Rufo*, 502 U.S. at 385).

In so holding the district court failed to give effect to the most applicable binding precedents—*Horne* and *John B. v. Emkes*, 710 F.3d 394 (6th Cir. 2013).[7] In *John B.*, this Court applied *Horne*'s "flexible approach" to terminate an institutional reform consent decree, considering two questions: "first, whether the state ha[d] achieved compliance with the federal-law provisions whose violation the decree sought to remedy; and second, whether the State would continue that

[7] Instead, the district court largely relied on pre-*Horne* cases, nonbinding cases, and cases that did not raise the issue of whether a durable remedy had been achieved, such as *Northridge Church*, in which the *plaintiff* sought to modify the consent decree, 647 F.3d at 608, and *Northeast Ohio Coal. for the Homeless v. Husted*, in which defendants argued that a change in state law—rather than implementation of a durable remedy—warranted termination, 696 F.3d 580, 603 (6th Cir. 2012); *see* Order, R. 708, PageID# 15404-15407, 15418-15422. The *Husted* Court's discussion of other *Rufo* factors does not control here because *John B.* makes clear that implementation of a durable remedy is sufficient for termination. *See Husted*, 696 F.3d at 603; *John B.*, 710 F.3d at 412-413. Further, the district court placed particular weight on *United States v. Tennessee*, a non-binding case in which (unlike here) the district court actually determined that a durable remedy had *not* been implemented; that finding, along with a finding that the closure of an institution had been contemplated at the time of entering the consent decree, made it necessary to also consider whether the State "agreed to the settlement in good faith, made a reasonable effort to comply with the settlement, and should be relieved of the undertaking under Rule 60(b)." 986 F. Supp. 2d 921, 934-936 (W.D. Tenn. 2012); *see* Order, R. 708, PageID# 15420-15422.

compliance in the absence of continued judicial supervision." 710 F.3d at 412. *Rufo* dealt only with a request to modify a consent decree based on changes, not an argument that an entire decree should be terminated based on implementation of a durable remedy. 502 U.S. at 389 n.12. By contrast, *Horne* and *John B.* are both more recent, binding, on-point authorities that elucidate how Rule 60(b)(5) applies when—as here—a party argues that a court should terminate its order because there is no longer any ongoing violation of law.

In both *Horne* and *John B.*, a durable remedy of the defendant's federal-law violations was the only significant change in circumstances required. *Horne*, 557 U.S. at 469-470; *John B.*, 710 F.3d at 412-413. And in neither case did the court require defendants to show that compliance had become more onerous or unworkable, that their implementation of a durable remedy was unanticipated, that they agreed to the decree in good faith,[8] or that they made a reasonable effort to comply with the decree

[8] *Horne* actually dealt with "a series of . . . orders and injunctions," rather than a consent decree, so the defendants' good faith in agreeing would not have been an issue. 557 U.S. at 441. But the same "dynamics of institutional reform litigation" that give rise to consent decrees in other contexts were also at issue in *Horne*, *id.* at 448; the Supreme Court noted that "[t]he record strongly suggest[ed] that some state officials ha[d]

and so should be relieved of compliance—facts relevant on the alternative paths to modification or termination in the *absence* of a durable remedy. *See Horne*, 557 U.S. at 469-470; *John B.*, 710 F.3d at 411-413; *Rufo*, 502 U.S. at 384-385. *Contra* Order, R. 708, PageID# 15419, 15422. Under *Horne* and *John B.*, the fact of a durable remedy itself makes continued enforcement detrimental to the public interest and warrants termination. *See Horne*, 557 U.S. at 447-450, 453; *John B.*, 710 F.3d at 412.

The district court concluded that *John B.* applied the *Rufo* standard. Order, R. 708, PageID# 15407. But the district court failed to acknowledge *how* the *John B.* Court applied *Rufo*: under *John B.*, and also *Horne*, the defendant's implementation of a durable remedy itself satisfies *Rufo*. *See Horne*, 557 U.S. at 447-450, 453; *John B.*, 710 F.3d at 412. No other showing is required. *Ibid.* And this case is squarely within *John B.* and *Horne*.

---

welcomed the involvement of the federal court as a means of achieving appropriations objectives that could not be achieved through the ordinary democratic process." *Id.* at 447 n.3. In any case, *John B.* makes clear that *Horne* applies when a party seeks termination of a consent decree under Rule 60(b)(5).

In *Horne*, the Supreme Court faulted the district court and court of appeals for focusing on whether the state defendants had satisfied the terms of the court's order, rather than focusing on whether there was any "ongoing violation of federal law." 557 U.S. at 453-456. The district court had declined to terminate an injunction because the state defendants had not funded the State's English Language-Learner program in accordance with the court's order. *Id.* at 455. But the Supreme Court held that this was error: the issue under Rule 60(b)(5) was whether the state was complying with the statutory mandate "to take 'appropriate action to overcome language barriers,'" not whether the state had funded its educational program in the manner required by the court's order. *Id.* at 459 (quoting 20 U.S.C. 1703(f)).

Here, the district court made the same error. Instead of considering whether there is any ongoing violation of the constitutional prohibitions on excessive force and unreasonable searches and seizures, the district court walked through the provisions of the consent decree in detail, concluding for each section that the City was not entitled to relief *because* it had not fully satisfied the specific terms of the decree. Order, R. 708, PageID# 15423-15454; *see, e.g.*, *id.* at 15451 ("[U]ntil Substantial and

Effective Compliance is show[n] across all the paragraphs in this section, the parties are not entitled to relief under Rule 60(b)(5).”). “Satisfaction of an earlier judgment is *one* of the enumerated bases for Rule 60(b)(5) relief—but it is not the only basis for such relief.” *Horne*, 557 U.S. at 454. As *Horne* made clear, the question for the court under Rule 60(b)(5)’s equitability analysis is *not* whether the defendant has complied with the district court’s chosen *means* of remedying the violation of federal law. *Horne*, 557 U.S. at 454-455 (criticizing the court of appeals for focusing on funding because “funding is simply a means, not the end”). The question is whether the violation of law has in fact been remedied. *Id.* at 454. And, here, the vast majority of provisions in the consent decree are nothing more than means to the end of ending excessive force and ensuring searches and seizures are performed constitutionally.

The City has implemented a durable remedy to any pattern or practice of excessive force and unreasonable searches and seizures. Consequently, continued enforcement of the Consent Decree “is not only unnecessary, but improper.” *Horne*, 557 U.S. at 450.

### B. The City has implemented a durable remedy to any pattern or practice of excessive force.

The Monitor recently assessed CDP's use of force and found that "[w]hen it comes to interacting with the public, . . . officers are generally following policies, supervisors are engaged, and when policy violations occur, there is internal identification of those issues, and the systems designed to address those violations are in place and working." 2025 Use of Force Assessment, R. 685, PageID# 14868.

CDP policy divides force into three categories, from Level 1, which is the least serious, to Level 3, the most serious. Use of Force Definitions, R. 255-1, PageID# 5091. In its review of Level 1 and Level 2 uses of force, the Monitor found that in 97% of cases reviewed "the officer's use of force was necessary, proportional, and objectively reasonable."[9] 2025 Use of Force Assessment, R. 685, PageID# 14869. Only one percent of these reviewed uses of force "were determined to not be objectively reasonable," and even then, the use of force resulted from "tactical or training

[9] CDP policies set a higher standard for uses of force than the constitutional threshold. Proportionality is an element of the *Graham v. Connor* assessment of objective reasonableness based on threat, severity, and resistance. *See* 490 U.S. 386, 396 (1989); *Little v. City of Owensboro*, No. 25-5078, 2026 WL 1865439, at *3 (6th Cir. June 29, 2026).

deficiencies rather than misconduct" and did not cause any "additional injuries to subjects," and the chain of command recognized the unreasonableness of the force and took corrective action. *Id.* at PageID# 14883. Notably, in a 2025 assessment of crisis intervention, the Monitor found that less than half of a percent of crisis incidents reviewed ended in a use of force. 2025 Crisis Intervention Assessment, R. 661-1, PageID# 14514. And across all three levels of force used, only about eight percent of uses of force over 2023-2024 were found to violate policy. 2025 Use of Force Assessment, R. 685, PageID# 14972, 14979. Given the Monitor's findings that appropriate policies are in place and that "the systems designed to address [policy] violations are in place and working," *id.* at PageID# 14868, this eight percent figure, gauged by an even more stringent standard than the constitutional threshold, demonstrates that there is no longer any pattern or practice of unreasonable force.

Furthermore, the Monitor concluded that use-of-force "[p]olicies are complete, reviewed, and updated as needed." 2025 Use of Force Assessment, R. 685, PageID# 14868. CDP has "provide[d] training to all officers on uses of force generally and on any new expectations" based on updated policies. *Id.* at PageID# 14891. And the Monitor stated that

"[t]he CDP has worked in earnest since 2017 on use of force." *Id.* at PageID# 14867. In fact, the Monitor has "recognize[d] that much of the City and CDP's work includes systemic changes implemented over a long-term trajectory." *Id.* at PageID# 14874. And the district court itself recognized the City's "extensive efforts to transform how officers and supervisors use and report force incidents." Order, R. 708, PageID# 15433. All of these facts—the longevity and extent of the City's commitment, the systemic nature of the changes, the fact that improvements are policy driven and backed by training—show that these remedies are durable, not transitory. *See Peery v. City of Miami*, 977 F.3d 1061, 1076 (11th Cir. 2020) (holding that implementation of various programs, as well as "formal police policies, constitute[d] a durable remedy").

The district court failed to even consider the baseline question of whether there is an ongoing violation of federal law and instead focused on perceived shortcomings in CDP's fulfillment of the specific provisions of the Consent Decree. But none of the district court's concerns show a present constitutional violation or the lack of a durable remedy—the only questions that matter under *Horne*.

The district court expressed concern about nonexistent or inadequate audits of tasers and Oleoresin Capsicum (OC) spray, the quality of the Force Review Board's self-analysis, and an increase in "the number of force incidents involving violence toward the police officer and for obstructing justice." Order, R. 708, PageID# 15431-15433. But none of these concerns show that CDP has a pattern or practice of using unreasonable force. Audits and critical self-analysis are a means of achieving an acceptable level of use of force; the lack thereof does not violate the Constitution unless it causes unreasonable force. *Cf. City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (discussing that the failure to train may give rise to municipal liability when the failure results from deliberate indifference and "actually causes injury"). And the Monitor's review showed only 2 uses of OC spray, both of which were reasonable, and 20 taser uses, 17 of which complied with the policy permitting use only (1) when there are grounds for detention and the subject is actively or aggressively resisting or when taser use is reasonable and necessary to protect someone and (2) when lesser means would be ineffective or, in the case of a protective use, have already been tried. 2025 Use of Force Assessment, R. 685, PageID# 14900-14901, 14912. When there is no

underlying constitutional violation, the Consent Decree's extra-constitutional requirements do not detract from CDPs durable remedy. Nor does a perceived lack on the part of the Force Review Board—a board charged with acting as a "quality control mechanism," not as the only level of review (Consent Decree, R. 502-1, PageID# 11618)—defeat the Monitor's overarching conclusion that "when policy violations occur, there is internal identification of those issues, and the systems designed to address those violations are in place and working." 2025 Use of Force Assessment, R. 685, PageID# 14868.

Furthermore, when the reasonableness of force already takes into account "the 'totality of the circumstances,'" *Barnes v. Felix*, 605 U.S. 73, 80 (2025) (quoting *County of Los Angeles v. Mendez*, 581 U.S. 420, 427-428 (2017)), the fact that certain crimes are more likely to result in a use of force does not matter. The important point is that CDP has a low rate of unreasonable force, and that it "has worked in earnest" to achieve that rate for the last nine years. 2025 Use of Force Assessment, R. 685, PageID# 14867. CDP has implemented a durable remedy to its prior unconstitutional use of force, and the district court abused its discretion in failing to terminate the use of force provisions of the Consent Decree.

### C. The City has implemented a durable remedy to any pattern or practice of unreasonable searches and seizures.

The City has also remedied any pattern or practice of unreasonable searches and seizures. Notably, the United States never actually "investigate[d] CDP's search, seizure, and arrest practices," but raised concerns based on the use-of-force investigation and sought the City's cooperation to implement a remedy "[g]iven the *possibility* that CDP's practices in this regard violate[d] the Constitution." Investigation of the Cleveland Division of Police, R. 1-1, PageID# 14 (emphasis added).

And the City has done so. In a 2025 report, the Monitor found that more than 95% of investigatory stops reviewed and more than 90% of traffic stops reviewed were supported by "sufficient articulation" of reasonable suspicion or probable cause, respectively. 2025 Search and Seizure Assessment, R. 672-1, PageID# 14658. And the remaining stops were not necessarily unconstitutional, as opposed to merely inadequately documented; "survey data revealed that there was insufficient reasonable suspicion or probable cause in *less* [sic] *than 2%* of investigatory stops and traffic stops respectively." *Id.* at PageID#

14658 (emphasis added); *see also id.* at PageID# 14660 ("[Subject matter experts] noted only one incident for not having sufficient reasonable suspicion to justify the stop, and were unable to evaluate the reasonable suspicion for nine other incidents."). When an investigatory stop led to a search, officers were able to articulate their justification 97% of the time, and about 85% of pat downs were supported by "specific and articulable facts to reasonably suspect that [the] particular person [wa]s armed and dangerous." *Id.* at PageID# 14660, 14662. And there is no indication that any stops were "longer than necessary to execute the appropriate police action." *Id.* at PageID# 14667.

Furthermore, the Monitor found that "CDP has made noteworthy progress in compliance in accordance with nearly all provisions of the Consent Decree's Search and Seizure requirements, particularly in regard to the sufficiency of officers' articulation of reasonable suspicion and probable cause, and the provision of sound foundational search and seizure training." 2025 Search and Seizure Assessment, R. 672-1, PageID# 14647; *see id.* at PageID# 14645 ("CDP has revised its search and seizure policies and implemented sound training protocols on

search and seizure."). Indeed, the district court approved new search and seizure policies and training in 2019. Order Approving Search and Seizure Policies, R. 261, PageID# 5178; Order Approving Search and Seizure Training Curriculum, R. 284, PageID# 6318. The City's implementation of fruitful training and "noteworthy progress" (2025 Search and Seizure Assessment, R. 672-1, PageID# 14647) show that this remedy—to the extent a remedy is even necessary for a *concern*—is durable.

The district court erred in failing to consider whether there was any ongoing violation of law and whether the City had implemented a durable remedy. Instead, the court focused on whether the City had achieved substantial and effective compliance or general compliance with each provision of the Consent Decree (Order, R. 708, PageID# 15437, 15439)—an improper focus under *Horne*, *see* 557 U.S. at 453-456. Indeed, under *Horne*, the absence of a finding of a pattern or practice of unconstitutional search and seizure, alone, should have been sufficient to vacate the Consent Decree. *See id.* at 450.

Instead, the district court's assessment questioned "data integrity challenges, such as the unavailability of some [body worn camera] videos

from 2023, and incident-level analysis issues arising from CDP's frequent use of 'stop operations,' in which a single incident number is used to document multiple stops in the operation." Order, R. 708, PageID# 15437. Consequently, the court concluded that "the Assessment upon which the parties rely is perhaps not as comprehensive as it could be." *Id.* at PageID# 15437.

But the court overlooked key points in reaching this conclusion. First, the Monitor in part accounted for these issues in the 2023 data by basing its assessment on 2024 data. 2025 Search and Seizure Assessment, R. 672-1, PageID# 14657. Second, the Consent Decree explicitly provides that CDP is *not required* to use body worn cameras (Consent Decree, R. 502-1, PageID# 11664), showing that the parties expected the Monitor to be able to adequately review CDP's practices without such camera footage. And finally, an assessment could always be more comprehensive, but the Monitor charged with reviewing CDP's searches and seizures did not find these "data integrity challenges" (Order, R. 708, PageID# 15437) insurmountable, as evidenced by its conclusion that the "vast majority of stops reviewed were" sufficiently supported (2025 Search and Seizure Assessment, R. 672-1, PageID#

14645), which is key to determining that a durable remedy has been implemented.

Second, the court expressed concern about the Monitor's report of racial disparity in traffic and investigatory stops. Order, R. 708, PageID# 15438. That concern was insufficient justification for failing to decide whether there is any ongoing violation of the Fourth Amendment and whether the City has implemented a durable remedy. In its initial investigation, the United States "ma[de] no finding regarding racial profiling" and did not "find predication to investigate whether CDP's practices discriminate against minority groups or otherwise deprive individuals of the protections provided by the Equal Protection Clause of the Fourteenth Amendment." Investigation of the Cleveland Division of Police, R. 1-1, PageID# 17, 57. Nor did the United States allege an Equal Protection claim in its Complaint. *See* Complaint, R. 1, PageID# 1-7. Likewise, in its 2025 assessment, the Monitor emphasized "that the presence of racial disparities . . . does not in itself constitute definitive evidence of racial bias or discriminatory behavior or intent." 2025 Search and Seizure Assessment, R. 672-1, PageID# 14670; *see also* Order, R. 708, PageID# 15429 (noting the Monitor's conclusion

that disparity is not on its own "evidence of intentional bias" (quoting Eighteenth Semiannual Report, R. 697, PageID# 15206.)). Given that no one—not the United States, not the Monitor, and not the district court—has found that CDP is unconstitutionally stopping or searching persons based on race, data that merely raises questions cannot be a reason for continuing to enforce a consent decree. The question under *John B.* is "whether the state has achieved compliance with the federal-law provisions *whose violation the decree sought to remedy*"—here, the Fourth Amendment. 710 F.3d at 412 (emphasis added).

The district court lamented a perceived "lack of accountability and willingness to continue a close working relationship with the Monitoring Team subject matter experts to address these apparent racial disparities." Order, R. 708, PageID# 15438. But the City *has* sought to address this issue by hiring an outside expert. *Id.* at PageID# 15438. The City has discretion to decide that working with the Monitor's experts is not the best way of moving forward. *Cf. Horne*, 557 U.S. at 448 ("Federalism concerns are heightened when . . . a federal-court decree has the effect of dictating state or local budget priorities."). The City can hardly be faulted if it is less than enthusiastic about

spending millions more of limited tax revenue for years to come to fix an issue that was not the basis of the Consent Decree and in fact may not even reflect a constitutional problem.

Third, the district court acknowledged that "the City and CDP have enacted many of the Agreement's required search and seizure training programs, procedures, and policies," but the court stated that "[w]hether officers and supervisors are complying with these procedures and policies over a sustained period of time is yet to be seen." Order, R. 708, PageID# 15438. But a durable remedy does not require a showing of compliance for a specific period of time. And that CDP's actual compliance with the Fourth Amendment is undergirded by policies and training supports a finding of durability. *See Peery*, 977 F.3d at 1076. Moreover, the City's progress across the spectrum of the Consent Decree's provisions, including, notably, the crisis intervention provisions (*see* Order, R. 708, PageID# 15435-15436), shows the City's commitment to making lasting improvements.

Finally, the district court expressed dissatisfaction with the overall percentages of traffic stops and pat downs for which there was an inadequate articulation of probable cause or reasonable suspicion,

respectively. Order, R. 708, PageID# 15439. But, as discussed above, a post-stop failure to fully articulate the grounds for a stop does not itself mean the stop was unconstitutional. *See* pp.34-35, *supra.* CDP has implemented appropriate training, and the Monitor has found "sufficient articulation" of the required grounds for "[t]he vast majority of stops reviewed." 2025 Search and Seizure Assessment, R. 672-1, PageID# 14645. Notably, the question is whether *the City* has remedied its own pattern or practice of unconstitutional searches or seizures—not whether every officer complies with constitutional standards on every occasion. The City's policies, training, and results show a pattern or practice of constitutional searches and seizures.

As with its analysis of use of force, the district court erred in denying the parties' Joint Motion to Terminate as to the search and seizure provisions of the Consent Decree based on how the Monitor had graded the City's compliance on each Search and Seizure paragraph in its recent assessment. Instead, the court should have answered the two questions that the *John B.* Court required: "first, whether the [City] has achieved compliance with the federal-law provisions whose violation the decree sought to remedy; and second, whether the [City]

would continue that compliance in the absence of continued judicial supervision." 710 F.3d at 412. The answer to both is "yes." The court pointed to no ongoing pattern or practice of search and seizure violations in light of the overwhelming record and agreement of the parties. The City clearly expressed its ongoing commitment to constitutional policing in the parties' Joint Motion. Joint Motion to Terminate Settlement Agreement, R. 688-2, PageID# 15112. Accordingly, the district court should have terminated the search and seizure provisions of the consent decree.

### D. The City's progress as to the Consent Decree's remaining provisions supports termination.

Under *John B.*, the City's implementation of a durable remedy to the constitutional violations that "the decree sought to remedy," 710 F.3d at 412—here, excessive force and unreasonable searches and seizures (though no findings supported the need of a remedy for the latter) in violation of the Fourth Amendment—warranted termination. Consequently, most of the Consent Decree's provisions were largely irrelevant to a proper Rule 60(b)(5) analysis. But the district court's treatment of these provisions further shows that it abused its discretion in denying the Joint Motion to Terminate.

First, as discussed, pp. 23-26, *supra*, Rule 60(b)(5) did not require the parties to show that compliance was onerous or unworkable, that enforcement was detrimental to the public interest, that their durable remedy was unanticipated, or (if the remedy was anticipated) that they had agreed to the Consent Decree in good faith, made a reasonable effort to comply, and should be relieved from further compliance. The district court erroneously required such a showing. Order, R. 708, PageID# 15419-15420, 15422. But even if these additional *Rufo* considerations applied here, they would favor termination.

The district court ostensibly considered the City's compliance with the Consent Decree's terms to determine whether the City had made a reasonable effort to comply. Order, R. 708, PageID# 15423-15453. Yet the court's analysis focused on whether the City had achieved a rating of substantial and effective compliance under the terms of the Consent Decree. *See, e.g.*, *id.* at PageID# 15451 ("[U]ntil Substantial and Effective Compliance is show[n] across all the paragraphs in this section, the parties are not entitled to relief under Rule 60(b)(5)."). The court improperly looked for "reasonable efforts to comply with *all*" of the Consent Decree's terms (*id.* at PageID# 15423

(emphasis added)), rather than taking the "flexible approach" that *Horne*, 557 U.S. at 450, requires (quoting *Rufo*, 502 U.S. at 381), an approach particularly necessary where, as here, the Consent Decree has hundreds of provisions.

Still, across various requirements of the Consent Decree, the court pointed out the City's positive work. *See* Order, R. 708, PageID# 15418 ("[T]he court has repeatedly commended the City and CDP, especially in recent years, for its progress towards substantial and effective compliance."); *id.* at PageID# 15435 ("[T]he City and CDP have consistently worked hard to achieve compliance with the Agreement's [crisis intervention team] terms."); *id.* at PageID# 15442 (referring to the Office of Professional Standards' work as "laudable" and showing "good progress"). But while praising the City for its progress, the court failed to acknowledge that this progress shows that the City agreed to the Consent Decree in good faith and has made reasonable efforts to comply, and that the City's remedial work is durable. The court instead turned its Rule 60(b)(5) analysis into a rehashing of whether termination was warranted under the Consent

Decree's terms, *i.e.*, applying the Consent Decree's termination provision rather than Rule 60(b)(5)'s change-in-fact standard.

The district court further erred in failing to give appropriate weight to the City officials' *uncontested* statements about the negative effects of the consent decree. The court acknowledged that several City officials "assert that the [Consent Decree] is inhibiting progress and [the] City's ability to address current policing challenges and community demands." Order, R. 708, PageID# 15422. But the court "f[ound] little value in the City officials' comments." *Id.* at PageID# 15422. That framing disregards the Supreme Court's direction that "'the officials of the State must be presumed to have a high degree of competence in deciding how best to discharge their governmental responsibilities." *Frew*, 540 U.S. at 442. The City "depends upon successor officials, both appointed and elected, to bring new insights and solutions to problems of allocating revenues and resources." *Id.* at 442. The district court faulted City officials for failing to provide "concrete examples" of how the Consent Decree is inhibiting progress. Order, R. 708, PageID# 15422. But City officials did provide examples. The president of the city council, for example, stated that the City needs flexibility to be able to implement a new crisis

response law. Joint Motion to Terminate Settlement Agreement, R. 688-2, PageID# 15121-15122. The mayor and the executive director of the Police Accountability Team likewise agreed that the Consent Decree inhibits efficiency and adaptability. *Id.* at PageID# 15131, 15136, 15138, 15143. The district court should have accepted these insights.[10] On the questions of unworkability, onerousness, and detriment to the public interest, City officials' perspectives are important and uncontested.

Second, the court failed to terminate even portions of the Consent Decree that the court acknowledged the City met, showing that the court was solely focused on overall compliance rather than a proper Rule 60(b)(5) analysis. *See Rufo*, 502 U.S. at 383 (holding that Rule 60(b)(5) authorizes modification when "a significant change in circumstances warrants revision of the decree" and "the proposed modification is suitably tailored to the changed circumstance"); *cf. id.* at 392 (requiring district courts to "defer to local government administrators, who have the primary responsibility for elucidating, assessing, and solving the

[10] Indeed, once a significant change warranting modification is established, a district court is *required* to "defer to local government administrators" on the question of appropriate modification. *Rufo*, 502 U.S. at 392.

problems of institutional reform, to resolve the intricacies of implementing a decree modification." (citation and internal quotation marks omitted)). As perhaps the most notable example, the district court "applaud[ed] CDP for implementing specialized [crisis intervention team] training programs that 'represent best practices in the field and have been recognized as national models'"; was "encouraged by the Monitor's findings that officers consistently demonstrate appropriate de-escalation techniques, calm demeanor, and professional conduct when responding to individuals in crisis"; and noted the "extremely low arrest rates and use of force in crisis incidents, as well as high rates of hospital transports." Order, R. 708, PageID# 15435 (quoting 2025 Crisis Intervention Assessment, R. 661-1, PageID# 14513). And the court recognized the City's consistent hard work and "genuine willingness to critically appraise prior practices," acknowledging that the City had achieved general or substantial and effective compliance with every crisis intervention provision. *Id.* at PageID# 15435-15436 (quoting Fifth Semiannual Report, R. 214, PageID# 4121). Yet for all this, the court did not terminate the crisis intervention portion of the Consent Decree. *Id.* at PageID# 15436.

Finally, the City's substantial progress across the board shows that its constitutional remedies are durable. For more than 11 years, the City has effectively implemented major improvements in policing. It has achieved great success. There is no reason to think that, without court monitoring, the City will start violating the Constitution. The district court should have given appropriate weight to the City's progress, the parties' agreement, the record of the Monitor's findings, and the absence of any finding, on the court's own part, of an existing pattern or practice of unconstitutional law enforcement misconduct. The court abused its discretion in failing to acknowledge that the City's remedy is durable.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's Order denying the Joint Motion to Terminate the Consent Decree and remand with instructions to terminate the Consent Decree.

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

R. JONAS GEISSLER
Deputy Assistant Attorney General

s/Andrew G. Braniff
ANDREW G. BRANIFF
MEREDITH L. BAKER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 532-3803

Date: October 30, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and 6 Cir. R. 32(b) because it contains 9,691 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 6 Cir. R. 32(b)(1). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Andrew G. Braniff
ANDREW G. BRANIFF
Attorney

Date: October 30, 2026

## ADDENDUM

## DESIGNATION OF RELEVANT RECORD ITEMS

| Document Description | Docket Entry Number | Page ID Range |
|---|---|---|
| Complaint | 1 | 1-7 |
| Investigation of the Cleveland Division of Police | 1-1 | 8-66 |
| Joint Motion for Entry of Consent Decree | 3 | 71-79 |
| Order granting Joint Motion for Entry of Consent Decree | 7 | 366-367 |
| Settlement Agreement | 7-1 | 368-477 |
| Fifth Semiannual Report | 214 | 4051-4244 |
| Use of Force Definitions | 255-1 | 5089-5092 |
| Order Approving Search and Seizure Policies | 261 | 5178 |
| Order Approving Search and Seizure Training Curriculum | 284 | 6318 |
| Second Modified Settlement Agreement (Consent Decree) | 502-1 | 11583-11802 |
| 2025 Crisis Intervention Assessment | 661-1 | 14511-14544 |
| 2025 Search and Seizure Assessment | 672-1 | 14642-14723 |
| 2025 Use of Force Assessment | 685 | 14861-14982 |
| Joint Motion to Terminate Settlement Agreement | 688-2 | 15069-15149 |
| Eighteenth Semiannual Report | 697 | 15163-15239 |
| Order denying Joint Motion to Terminate Settlement Agreement | 708 | 15386-15459 |
| Notice of Appeal | 712 | 15465 |