# No. 26-3617

# In the United States Court of Appeals for the Sixth Circuit

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

CITY OF CLEVELAND, OH
*Defendant-Appellee*

---

LISA SCHIAVO BLATT, ERIN MARIE SIELAFF,
*Amicae Curiae*.

---

On Appeal from the United States District Court
for the Northern District of Ohio, Eastern Division
No. 1:15-cv-01046 (Hon. Solomon Oliver, Jr.)

---

**BRIEF OF THE NEW CIVIL LIBERTIES ALLIANCE AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

Margot Cleveland
*Counsel of Record*
Caitlin M. Moyna
Margaret A. Little
Markham S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
(202) 869-5210
margot.cleveland@ncla.legal
*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A) and Sixth Circuit Rule 26.1, *amicus curiae* the New Civil Liberties Alliance states that it is a nonprofit organization. It has no parent corporation, and it issues no stock. No publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF INTEREST OF AMICUS CURIAE ..........................................1

RULE 29(a)(2) AND 29(a)(4)(E) STATEMENTS ..................................................3

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ...........................................................................................7

I. ARTICLE III ONLY PERMITS A FEDERAL COURT TO EXERCISE JUDICIAL POWER OVER A LIVE CONTROVERSY BETWEEN ADVERSE PARTIES..........7

A. The Case-or-Controversy Requirement Confines Judges to Resolving Real Disputes Between Adverse Parties.........................7

B. The District Court Has Been Exercising Continuing Jurisdiction over an Agreed-upon Contract, Not a Controversy .........................8

C. Whatever Controversy Once Existed Has Ended, and a Court Cannot Supply the Missing Adversity Itself.................................10

II. THE CLEVELAND DECREE EXCEEDS WHAT THE LAW OR A REMEDY DEMANDS, IN VIOLATION OF ARTICLES I AND III OF THE CONSTITUTION .........................................................................11

A. The Decree Requires More than Federal Law Does and More than a Remedy for Its Violation Demands ...................................12

B. The Cleveland Decree Undemocratically Binds Successive Administrations to the Policy Choices of Their Predecessors.......15

C. The Cleveland Decree's Vague, Aspirational Goals Make Compliance a Moving Target and, in Effect, Render It Perpetual...........................................................................19

III. THE CLEVELAND DECREE UNCONSTITUTIONALLY GIVES LEGISLATIVE AND EXECUTIVE POWERS TO A PRIVATE MONITOR................................21

A. The Monitor Exercises Local Legislative and Executive Governmental Power ....................................................21

B. By Granting Local Legislative and Executive Powers to the Monitor, the Court Violates the Constitution ...............................22

IV. THE DECREE VIOLATES THE SUPREMACY CLAUSE BY DISPLACING STATE AND LOCAL LAW WITH AN INSTRUMENT THAT IS NOT FEDERAL LAW ....................25

CONCLUSION ....................27

CERTIFICATE OF COMPLIANCE ....................28

CERTIFICATE OF SERVICE ....................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ........ 8

*Bd. of Educ. of Okla. City Pub. Schs. v. Dowell*,
498 U.S. 237 (1991) ........ 19

*Boyd v. Alabama*,
94 U.S. 645 (1876) ........ 16

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936) ........ 23

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ........ 23

*Cobell v. Norton*,
334 F.3d 1128 (D.C. Cir. 2003) ........ 24

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
575 U.S. 43 (2015) ........ 23-24

*FCC v. Consumers' Research*,
606 U.S. 656 (2025) ........ 24

*Flast v. Cohen*,
392 U.S. 83 (1968) ........ 7

*Freeman v. Pitts*,
503 U.S. 467 (1992) ........ 19

*Frew ex rel. Frew v. Hawkins*,
540 U.S. 431 (2004) ........ 12, 18, 19

*Horne v. Flores*, 557 U.S. 433 (2009) ........ 14-15, 18, 19, 25

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
478 U.S. 501 (1986) ........ 4, 8, 12, 16

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ........ 7

*Milliken v. Bradley*, 433 U.S. 267 (1977) ........ 12

*Moore v. Charlotte-Mecklenburg Bd. of Educ.*,
402 U.S. 47 (1971) ........ 8

*Morrison v. Olson*,
487 U.S. 654 (1988) ........................................................................................23

*Murphy v. NCAA*,
584 U.S. 453 (2018) ........................................................................................25

*New York v. United States*,
505 U.S. 144 (1992) ........................................................................................26

*Northwest Env't Advocs. v. EPA*,
340 F.3d 853 (9th Cir. 2003)............................................................................17

*Poe v. Ullman*,
367 U.S. 497 (1961) ..........................................................................................7

*Ragsdale v. Turnock*,
941 F.2d 501 (7th Cir. 1991)............................................................................18

*Rizzo v. Goode*,
423 U.S. 362 (1976) ........................................................................................26

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) ........................................................................................18

*Stone v. Mississippi*,
101 U.S. 814 (1879) ........................................................................................16

*United States v. ITT Cont'l Baking Co.*,
420 U.S. 223 (1975) ................................................................................... 16-17

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) ........................................................................................11

**Other Authorities**

*Federal Consent Decree Fairness Act:*
*Hearing on H.R. 1229 Before the Subcomm. on Cts., the Internet, and Intell. Prop. of the Comm. on the Judiciary*, 109th Cong. (June 21, 2005) ...................15

Frank H. Easterbrook,
*Justice and Contract in Consent Judgments*, 1987 U. Chi. Legal F. 19 (1987) ..............................................................................................................17

Jeremy A. Rabkin & Neal E. Devins,
*Averting Government by Consent Decree: Constitutional Limitations on Settlements with the Federal Government*, 40 Stan. L. Rev. 203 (1987) ...........17

John Jay,
*Chief-Justice Jay and Associate Justices to President Washington*, (Aug. 8,

1793), *in* 3 THE CORRESPONDENCE AND PUBLIC PAPERS OF JOHN JAY (Henry P. Johnston ed., 1891) ....................7

Michael W. McConnell, *Why Hold Elections? Using Consent Decrees to Insulate Policies from Political Change*, 1987 U. Chi. Legal F. 295 (1987)....................17

Ross Sandler and David Schoenbrod, *Democracy by Decree* (2003) .................... 14, 15, 20

**Rules**

Fed. R. Civ. P. 53(a)(1)....................24

Fed. R. Civ. P. 53(b)(2)....................24

Fed. R. Civ. P. 53(f)(3) ....................24

Fed. R. Civ. P. 53(f)(4) ....................24

**Constitutional Provisions**

U.S. Const. art. III, § 1 ....................22

U.S. Const. art. III, § 2, cl. 1 ....................7, 8

U.S. Const. art. VI, cl. 2....................5, 25

## STATEMENT OF INTEREST OF AMICUS CURIAE

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil rights organization and public-interest law firm devoted to defending constitutional freedoms from the administrative state's depredations. Professor Philip Hamburger founded NCLA to challenge constitutional defects in the modern administrative state through original litigation, *amicus curiae* briefs, and other advocacy.

The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as the right to a jury trial, to due process of law, and to have laws made by the nation's elected legislators (*i.e.*, the right to self-government). These selfsame civil rights are also very contemporary—and in dire need of renewed vindication—precisely because Congress, executive branch officials, administrative agencies, and some courts have neglected them for so long.

NCLA aims to defend civil liberties, including the freedom of Americans to govern themselves—centrally through laws made by their representative legislatures and applied by independent judges. Although Americans still enjoy the shell of their Republic, a very different sort of government has developed within it—a type that the Constitution was designed to prevent. This unconstitutional drift away from lawfully binding constitutional governance is the focus of NCLA's concern.

Here, Cleveland's consent decree regarding the Cleveland Division of Police ("CDP") offends a host of constitutional provisions, divesting Americans of their

freedom to govern themselves through their elected legislators (*i.e.*, city council members), their freedom to have their elected and accountable executive (*i.e.*, the mayor) carry out the law, and their right to have the judges confine themselves to actual cases and controversies and follow the law. NCLA has a direct interest in ensuring that this Court evaluate the consent decree in accord with the Constitution's guarantees and strictures.

## RULE 29(a)(2) AND 29(a)(4)(E) STATEMENTS

All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no person other than *amicus*, its members, or its counsel contributed money intended to fund preparing or submitting this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Many consent decrees are useful to resolve disputes and combat unlawful practices. Consent decrees that are lawful bind only the parties thereto and do not impose requirements that exceed what the law demands. They envision a limited role, if any, for the court in enforcing their terms, and they expire promptly when their ends are met. But some consent decrees, such as the one binding the CDP, are incompatible with the Constitution for myriad reasons. The decree at issue here commissions an Article III court to exercise judicial power absent a case or controversy. It substitutes negotiated policy for democratic lawmaking. It then binds future administrations to that negotiated policy, regardless of the electorate's preferences. It improperly hands executive and legislative powers to private monitors who answer to no one, in violation of Articles I and III of the Constitution. And it offends principles of federalism and the Constitution's Supremacy Clause by overriding state and local law with an instrument that is not federal law. Although a

long line of Supreme Court cases appears to have tolerated such decrees, beginning with *Local No. 93, International Association of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986), the settlement between the City of Cleveland and the United States Department of Justice here (the "Cleveland Decree") highlights why and how these prior cases erred in failing to consider the following serious constitutional violations that consent decrees like this one impose.

**First**, the Cleveland Decree offends the fundamental principles of Article III of the Constitution, which extends to courts only the power to decide cases and controversies. This means that the parties must be genuinely adverse at every stage of the litigation. But that notion is ignored in cases where district courts exercise continuing jurisdiction over parties that negotiated a consent decree in advance. Here, the Cleveland Decree was fully negotiated and agreed to by the parties *prior to the filing of a complaint*. The district court was thus asked merely to ratify an agreement and then administer it for years. There was never any adjudication, nor any admission of liability. Today both the City of Cleveland and the U.S. Department of Justice ask the Court to end the Decree. The only participant insisting that it continue is the district court, which lacked jurisdiction from the outset. There is not now—and never was—a case or controversy, so the district court lacks jurisdiction to continue its oversight.

**Second**, the Cleveland Decree imposes obligations beyond anything federal law requires and thus violates Articles I and III of the Constitution. This is true in many cases of "institutional reform litigation," such as this one, which seeks to overhaul an entire municipal police department. The Cleveland Decree expressly purports to bind future officials and voters to their predecessors' bargain, notwithstanding the longstanding rule that a government cannot contract away its successors' power to govern. Even worse, it requires the parties to pursue goals so subjective that goal posts are vague and easily moved, ensuring that the regime endures for many years beyond its original contemplated tenure.

**Third**, the district court had no authority to exercise local legislative or executive power, much less to vest such power in a private monitor. Yet that is exactly the course the Cleveland Decree has taken. The judicial branch may not redistribute powers which do not belong to it in the first place. Such redistribution violates the vesting clauses of the United States Constitution.

**Fourth**, the Cleveland Decree violates the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2, which allows only federal *law* to displace state and local law. A decree that exceeds federal law is not federal law; it is merely a set of (contractual) conditions agreed to by consenting parties and endorsed by a judge. Although a judicial judgment of liability that includes a lawful remedy would legally bind the parties to the judgment, that is not what this Decree is. The

Constitution's vertical separation of powers between the federal government and the states—instantiating principles of federalism—exists to protect the citizenry, not the officials who agreed to the Decree, nor those public officials who govern Cleveland today. Hence, the parties' consent provides no authority to breach constitutional limits.

In part for these reasons, the DOJ and the City of Cleveland jointly moved to terminate the Decree. Order, R. 708, Page ID ## 15386-15387, 15395-15396. The Cleveland Decree itself provides that it "is enforceable only by the Parties." Settlement Agreement, R. 3-1, Page ID # 181. Yet the district court denied the motion, faulted the parties for failing to raise arguments against themselves, and dismissed as "self-serving" the elected Mayor's and elected Council President's sworn accounts of how the Decree burdens their operation of government. Order, R. 708, Page ID #15422. The district court has imposed rules—made by negotiators, not legislators—on subsequent city administrations. Its private monitor has exercised executive and legislative powers for more than eleven years. These many constitutional affronts present a grave danger to liberty and self-government.

To preserve and protect the vital constitutional principles at stake, *amicus curiae* urges the Court to reverse the district court's ruling overriding the parties' decision to terminate the consent decree.

## ARGUMENT

### I. ARTICLE III ONLY PERMITS A FEDERAL COURT TO EXERCISE JUDICIAL POWER OVER A LIVE CONTROVERSY BETWEEN ADVERSE PARTIES

#### A. The Case-or-Controversy Requirement Confines Judges to Resolving Real Disputes Between Adverse Parties

Article III extends "[t]he judicial Power" only to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. That phrase provides the textual limit defining "the role assigned to the judiciary in a tripartite allocation of power." *Flast v. Cohen*, 392 U.S. 83, 95 (1968).

The limit has existed since our nation's founding. In 1793, the Justices of the Supreme Court declined President Washington's request for legal advice on neutrality, citing "the lines of separation drawn by the Constitution between the three departments." John Jay, *Chief-Justice Jay and Associate Justices to President Washington*, (Aug. 8, 1793), *in* 3 THE CORRESPONDENCE AND PUBLIC PAPERS OF JOHN JAY 488, 489 (Henry P. Johnston ed., 1891). Chief Justice Marshall grounded judicial review itself in the fact that "[t]hose who apply the rule to particular cases, must of necessity expound and interpret that rule." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

Adversity is at the core of judicial power. "[T]he adjudicatory process is most securely founded when it is exercised under the impact of a lively conflict between antagonistic demands, actively pressed." *Poe v. Ullman*, 367 U.S. 497, 503 (1961). Thus, where, as here, "both litigants desire precisely the same result," there is "no

case or controversy within the meaning of Art. III." *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 47–48 (1971) (per curiam). And the controversy must persist "at all stages of review, not merely at the time the complaint is filed." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted). Were the rule otherwise, parties could present to a compliant court negotiated deals that operate as laws, bypassing bicameral legislation and presentment.

### B. The District Court Has Been Exercising Continuing Jurisdiction over an Agreed-upon Contract, Not a Controversy

*Local No. 93* sets out the current doctrinal requirements for a court's jurisdiction to enter and administer consent decrees as follows: the court must have subject matter jurisdiction over the complaint, the decree must come "within the general scope of the case made by the pleadings," the decree must pertain to "the objectives of the law upon which the complaint was based," and the decree cannot require anything unlawful. 478 U.S. at 525–26. That test has led some courts to assume that they can be indifferent as to whether the settlement arose from an underlying controversy, but those test factors do not, and cannot, relieve a federal court from the Constitution's restriction of judicial power to cases and controversies. *See* Art. III, § 2.

In *Local No. 93*, the Supreme Court candidly found the decree's force in the parties' bargain: "it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations

embodied in a consent decree." 478 U.S. at 522. The obligation of such a contract, however, is not within a federal court's jurisdiction where there is no case or controversy. This is the difficulty with the Cleveland Decree.

In March 2013, then-Mayor of Cleveland Frank Jackson was among those who asked the DOJ to investigate his city's police department. Order, R. 708, Page ID # 15388. After the DOJ issued its findings, the City and the DOJ issued a "Joint Statement of Principles" and agreed to commence discussions in order to reach "a court-enforceable settlement agreement, to include the appointment of an outside independent monitor to ensure compliance with" its terms. Settlement Agreement, R. 3-1, Page ID ## 86-87. On May 26, 2015, the DOJ filed its complaint and the parties, on the same day, filed a joint motion to enter into the 105-page agreement. Order, R. 708, Page ID ## 15396-15397. Thus, even if there had been an earlier dispute, by the time the complaint was filed, it was no longer a matter in dispute.

The district court held a single hearing and entered the Cleveland Decree 17 days later, describing it as "a good agreement" that "we all ought to be happy to embrace." Order, R. 708, Page ID ## 15398-15399. The district court adjudicated no claim, nor did it make a single finding of liability. Its only role was to approve what the parties had already decided. Thus, there was no case or controversy in the sense required by Article III.

Defenders of consent decrees often observe that settlement is a traditional and favored way to end lawsuits and that settlement is good in its own right. But that assumes there is first an underlying dispute within the jurisdiction of the courts. Here, without any disputed case or controversy before it, the district court took jurisdiction and made itself an extraconstitutional (and now apparently permanent) supervisor of an unlegislated governmental operation. It asserted jurisdiction that is utterly without foundation in Article III.

### C. Whatever Controversy Once Existed Has Ended, and a Court Cannot Supply the Missing Adversity Itself

Even if (contrary to the acknowledged facts) there was a disputed case or controversy when the Cleveland Decree was presented to the district court in 2015, there is no such dispute now. Both the DOJ and the City of Cleveland agree the Decree should end. They are the only entities with power to enforce the Decree, Settlement Agreement, R. 3-1, Page ID # 181, and neither seeks enforcement. Quite the opposite, they both seek dissolution of the Decree, which means there is no current dispute between the parties and no jurisdiction in the courts.

The district court itself has attempted to supply the necessary adversity. It acknowledged that, because the motion was joint, “no party would be filing a brief in opposition.” Order, R. 708, Page ID ## 15386-15387. Then it constructed the opposing case on its own: it faulted the parties for not addressing a sustainment-period argument against themselves, catalogued compliance gaps the parties did not

concede and rejected the elected officials' affidavits as "self-serving." Order, R. 708, Page ID 15422. The district court played the role first, of adversary, and then, of judge. It is no surprise, then, that it found its own arguments more persuasive! Worse, it has contravened the "party presentation principle," which recognizes that "parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (remanding appeal where the appeals panel *sua sponte* "ordered further [*amicus*] briefing" from three organizations it hand-picked).

## II. THE CLEVELAND DECREE EXCEEDS WHAT THE LAW OR A REMEDY DEMANDS, IN VIOLATION OF ARTICLES I AND III OF THE CONSTITUTION

A consent decree is not just a settlement between the parties. To the extent it is a court judgment, it must be consistent with the law and the duty of judges and cannot require more than the law requires, nor more than a lawful remedy may require. The Cleveland Decree, however, does not merely follow the applicable law and remedy its violation. It requires what the law does not and goes beyond what could be reasonably understood as a remedy. Indeed, it binds Cleveland's government for longer than is required for remedial purposes for an indeterminate period chosen by the court. The court thereby strays beyond Article III's judicial power and intrudes on Congress's legislative power.

### A. The Decree Requires More than Federal Law Does and More than a Remedy for Its Violation Demands

Institutional reform litigation, such as this case, often begins with a particular event that sparks public outrage directed to a state or local government entity. The goal of the litigation is not merely to rectify the events leading to the controversy, but rather to overhaul the entire governmental entity at issue for years or decades to come. In the process, consent decrees can impose conditions and requirements that go beyond what can be squared with the requirements of federal law or of a remedy for its violation. That is one of the problems with the Cleveland Decree—it exceeds the power vested in the courts and trespasses on the legislative power of Congress.

The Supreme Court has stated that "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation." *Milliken v. Bradley*, 433 U.S. 267, 282 (1977). And it has warned that consent decrees involving state and local governments must be "limited to reasonable and necessary implementations of federal law," lest they "improperly deprive future officials of their designated legislative and executive powers." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004).

*Local No. 93*, 478 U.S. at 525, nonetheless held that a court "is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." But when, as here, the parties

consent to relief that is not required by federal law and that cannot be explained as a lawful remedy for its violation, then it is outside the judicial power of the courts, and it invades legislative territory.

The Cleveland Decree, for example, states that its purpose is to ensure policing that is "constitutional, effective, and consistent with community values." Settlement Agreement, R. 3-1, Page ID # 85. Constitutional policing is, indeed, required by law, but it is not so clear that the Constitution demands consistency with community values. Among its 400-plus paragraphs, the Decree requires the City of Cleveland to:

- provide "an adequate number of computers" and "operable and safe zone cars" with mobile dispatch systems, *id.* at Page ID # 152;
- have the Mayor "work with the City Council to develop an ordinance to place a Charter Amendment on the ballot" concerning hiring flexibility, *id.* at Page ID # 154;
- train officers on "historical and cultural systems that perpetuate racial and ethnic profiling," "self-evaluation strategies to identify racial or ethnic profiling" and "District-level cultural competency training regarding the histories and culture of local immigrant and ethnic communities," *id.* at Page ID ## 96-97; and
- conduct a biennial survey, which must be done "in English, Spanish, and other languages, as necessary, to ensure representation of the entire Cleveland community" of residents' "perceptions" of the police to measure

"public satisfaction with policing, attitudes among police personnel, and the quality of police-citizen encounters," *id.* at Page ID ## 167-168.

Whether these are sensible policies is subject to debate, but the Constitution does not require them. Indeed, the parties told the district court that Fourth Amendment compliance "does not require these reforms." Order, R. 708, Page ID # 15408. Yet this is a well-known feature of consent decrees. As two leading scholars on the topic have observed, "judges enter decrees that go beyond correcting violations of law and usurp the policy-making prerogatives of the elected branches of state and local governments[.]" Ross Sandler and David Schoenbrod, *Democracy by Decree*, 123 (2003).

The incentives behind such decrees are well understood. Public officials "sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law," because officials constrained by budgets and politics "frequently win by losing." *Horne v. Flores*, 557 U.S. 433, 448-449 (2009) (citations omitted). Sandler and Schoenbrod described the process to Congress this way:

> [P]laintiffs' attorneys [easily] find some "legal hook" that they can use to draft a complaint because Congress and federal agencies have created so many standards applicable to state and local programs that most programs are in violation. . . . Those sitting around the negotiating table include the plaintiffs' attorneys, defendant officials, and government attorneys . . . . Through a process of horse trading, they construct a plan to change it. . . . These plans

> are not tethered to the rights that give rise to the suit, but rather reflect the controlling group's collective idea about how to make the program [r]un better. . . . The signature of a judge turns this plan into a federal court order that must be obeyed by . . . . their successors in office. Many decrees last for decades.

*Federal Consent Decree Fairness Act: Hearing on H.R. 1229 Before the Subcomm. on Cts., the Internet, and Intell. Prop. of the Comm. on the Judiciary*, 109th Cong. 30 (June 21, 2005) (statement of Ross Sandler & David Schoenbrod); *see also* Sandler & Schoenbrod, *Democracy by Decree* (2003). The Cleveland Decree is no different; it is untethered from the law.

### B. The Cleveland Decree Undemocratically Binds Successive Administrations to the Policy Choices of Their Predecessors

The Cleveland Decree "is binding upon all Parties hereto, by and through their officials, agents, employees, *and successors*." Settlement Agreement, R. 3-1, Page ID # 88 (emphasis added). That feature, common in consent decrees, is the point of the exercise. A policy adopted by ordinance or executive order lasts only until the next election; a policy embedded in a federal decree runs into the future, until a federal judge releases the parties. "The upshot is that consent decrees are largely insulated from change by elected officials even though the decrees have not been ratified by either the legislature or the voters, and they include commitments that go beyond legal requirements or are irrelevant to them." Sandler and Schoenbrod, *Democracy by Decree*, at 128.

But such a decree, unless it requires no more than what is demanded by the law or a lawful remedy, unconstitutionally restricts the local government. It is well-settled that a government cannot contract away the governing powers of its successors:

> [T]he power of governing is a trust committed by the people to the government, no part of which can be granted away. The people, in their sovereign capacity, have established their agencies for the preservation of the public health and the public morals, and the protection of public and private rights. These several agencies can govern according to their discretion, if within the scope of their general authority, while in power; but they cannot give away *nor sell the discretion of those that are to come after them*, in respect to matters the government of which, from the very nature of things, must "vary with varying circumstances."

*Stone v. Mississippi*, 101 U.S. 814, 820 (1879) (emphasis added) (citation omitted); *see also Boyd v. Alabama*, 94 U.S. 645, 650 (1876) ("We are not prepared to admit that it is competent for one legislature, by any contract with an individual, to restrain the power of a subsequent legislature to legislate for the public welfare."). This reasoning applies here because, as already observed, the Cleveland Decree goes beyond the law and a lawful remedy for its violation, and to that extent it is merely an agreement between the City of Cleveland and the DOJ—an agreement that unlawfully confines local government. *Local No. 93*, 478 U.S. at 522.

In addition, consent decrees must "be construed for enforcement purposes basically as a contract." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238

(1975). It follows that "what parties cannot agree to in ordinary contracts, they cannot make binding through consent decrees." Jeremy A. Rabkin & Neal E. Devins, *Averting Government by Consent Decree: Constitutional Limitations on Settlements with the Federal Government*, 40 Stan. L. Rev. 203, 209 (1987).

These limitations are important protections for civil liberties. There is tremendous potential—and temptation—for politicians to collude in order to circumvent constitutionally prescribed methods of policymaking. As Professor Frank H. Easterbrook explained, an agency's new regulation "would last only for the duration of the incumbent official; a successor with a different view could promulgate a new regulation. *Both parties to the litigation therefore may want a judicial decree that ties the hands of the successor*." *Justice and Contract in Consent Judgments*, 1987 U. Chi. Legal F. 19, 33-34 (1987) (emphasis added); *see* Michael W. McConnell, *Why Hold Elections? Using Consent Decrees to Insulate Policies from Political Change*, 1987 U. Chi. Legal F. 295, 296-97 (1987) (explaining that consent decrees have become a mode of policymaking because "executive officials in one Administration can set policy today *and* bind their successors to comply with it tomorrow, by settling a lawsuit on those terms") (emphasis in original).[1]

[1] Not all federal judges are blind to the risk of collusion. *See Northwest Env't Advocs. v. EPA*, 340 F.3d 853, 855 (9th Cir. 2003) (Kleinfeld, J., dissenting) ("Though I do not intimate that it is so in this case, consent decrees between advocacy groups and agencies present a risk of collusion to avoid executive and ultimately democratic control over the agencies. An agency that cannot get its agenda approved within the executive branch can get itself sued and consent to a judicial decree commanding it to do what it wants to do. We should avoid enmeshing ourselves in a process that

The Supreme Court understands the difficulty. It has observed that consent decrees "bind state and local officials to the policy preferences of their predecessors and may thereby 'improperly deprive future officials of their designated legislative and executive powers.'" *Horne*, 557 U.S. at 449 (quoting *Frew*, 540 U.S. at 441); *see also Frew*, 540 U.S. at 442 ("A State, in the ordinary course, depends upon successor officials, both appointed and elected, to bring new insights and solutions to problems of allocating revenues and resources.").

Consent decrees that bind into the future can make sense between private contracting parties. But they are constitutionally problematic when they prevent a local government from exercising its constitutional authority to govern and deprive the people of their constitutional freedom to elect a local government that will carry out their entirely lawful preferences (that may be contrary to the consent decree).

The Supreme Court recognized in *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 385 (1992), that, at least with regard to anticipated changed conditions, the parties bore a "heavy burden to convince a court" that they should be permitted to modify the decree accordingly. In that setting, *Rufo*'s "heavy burden" operates to ensure that a consent decree will endure in perpetuity. The court's more recent

---

lends itself to such evasion of the democratic process."); *Ragsdale v. Turnock*, 941 F.2d 501, 517 (7th Cir. 1991) (Flaum, J., concurring in part and dissenting in part) ("[I]t is not uncommon for consent decrees to be entered into on terms favorable to those challenging governmental action because of rifts within the bureaucracy or between the executive and legislative branches.").

decisions, however, acknowledge the constitutional flaws of extended "rule by decree." In *Horne v. Flores*, 557 U.S. at 449, the Court directed courts to return authority "promptly" once federal-law violations are remedied. This was explicitly premised on the danger that consent decrees "bind state and local officials to the policy preferences of their predecessors." *Id.* (citing *Frew*, 540 U.S. at 441). The Court should apply this current Supreme Court standard to the Cleveland Decree.

### C. The Cleveland Decree's Vague, Aspirational Goals Make Compliance a Moving Target and, in Effect, Render It Perpetual

The Supreme Court has held that decrees supervising local institutions are "not intended to operate in perpetuity," *Bd. of Educ. of Okla. City Pub. Schs. v. Dowell*, 498 U.S. 237, 248 (1991), and that returning those institutions "to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system," *Freeman v. Pitts*, 503 U.S. 467, 490 (1992). A decree whose goals cannot be objectively met is incompatible with that command.

The Cleveland Decree defines success as policing "consistent with community values" and that fosters "a strong relationship that is built on mutual trust and respect" between the CDP and the Cleveland community. Settlement Agreement, R. 3-1, Page ID # 85. It permits termination when the CDP "has achieved sustained and continuing improvement in constitutional policing," *id.* at Page ID ## 180–81, ¶ 401—an improvement standard that, by use of the term

"continuing," never ends. The district court reasoned that "[t]he Consent Decree is not a checklist. It is a framework for systemic change." Order, R. 708, Page ID # 15,456. But without a checklist, compliance is impossible to assess, and the vague Cleveland Decree thus could operate without clear standards in perpetuity.

A decree structured this way does not have to wind down. It renews itself. And the record confirms this. The Monitor's appointment was to last five years, with extension past seven only on a judicial finding of necessity. Settlement Agreement, R. 3-1, Page ID # 165, ¶ 355. The Decree is now in its twelfth year and is being overseen by its fourth Monitor. 708, Page ID ## 15,402–03. The Cleveland officials who obtained the Decree succeeded in using the Court to impose their will on later elected officials.[2]

Achievement of aspirational goals is even more challenging considering that in order to comply, "officials need funding, legislation, and significant cooperation from other agencies and the public." Sandler & Schoenbrod, *supra*, at 107. And the means to achieve those aspirational goals are often "highly specific orders against state and local defendants, with or without their consent, which answer policy

[2] Exacerbating the danger is a conflict of interest. The Monitor overseeing the Cleveland Decree is highly compensated, at a rate of roughly $100,000 per month. *See, e.g.*, Amended Order of Disbursement, R. 736, Page ID # 15,831 (disbursement of $94,623 to pay Monitor for services in June 2026); Order of Disbursement, R. 714, Page ID # 15,468 (disbursement of $100,124 to pay Monitor for services in April 2026); Order of Disbursement, R. 693, Page ID # 15,159 (disbursement of $123,844 to pay Monitor for services in December 2025). Such compensation means that however principled the Monitor may be, he or she has a strong financial interest in the continuation of the Decree.

questions that elected officials traditionally answered." *Id.* at 109. In the meantime, "[j]udicial enforcement has gone from being a declaration of rights to a managerial process," leaving courts "up to their necks in budgetary, personnel, regulatory, and programmatic choices of the kind previously made only by elected state and local officials and their appointees." *Id.* at 109-110.

## III. THE CLEVELAND DECREE UNCONSTITUTIONALLY GIVES LEGISLATIVE AND EXECUTIVE POWERS TO A PRIVATE MONITOR

The district court has no authority to exercise local legislative or executive power or to vest such powers in a monitor. Nonetheless, that is what the district court has done in this case.

### A. The Monitor Exercises Local Legislative and Executive Governmental Power

The Cleveland Decree creates an "Independent Monitor," selected by the parties, approved by the court and paid entirely by the City of Cleveland. Settlement Agreement, R. 3-1, Page ID ## 164–66, ¶¶ 350, 353, 356. It describes the Monitor as "an agent of the Court." *Id.* at Page ID # 164, ¶ 351. The Monitor, charged with overseeing compliance with the Cleveland Decree's mandates, is endowed with executive power and legislative powers. It is encouraged to "review and recommend any changes to the outcome measures" that it "deems useful in assessing whether implementation of [the consent decree] is resulting in constitutional policing." *Id.* at Page ID # 172, ¶ 368. Further, it is charged with developing a "methodology for the assessment, review, or audit" of any metric it measures. *Id.* at Page ID # 173, ¶ 371.

The Monitor has submitted regular assessment reports that graded compliance on various provisions of the consent decree. 708, Page ID ## 15,411–15. The district court treated those grades as dispositive: no paragraph could reach the Cleveland Decree's exit standard unless the Monitor had formally deemed it to be substantially complete. *Id.* at Page ID ## 15,415–18. In practice, the Monitor decides what Cleveland must do to regain control of its own police department, and when it has done enough. For example, the Monitor's semiannual reports—which assess whether the Cleveland Decree's goals have been met on a paragraph-by-paragraph basis—"consider a range of factors, as well as both quantitative and qualitative measures" to determine compliance for each provision. 2025 Use of Force Assessment, R. 685, Page ID # 14,876. These factors become obligations layered on top of those already imposed by the Cleveland Decree itself.

This sort of control over the CDP is a combination of legislative and executive powers. Writing new requirements in the name of "community values" is lawmaking. Directing how a police department recruits, equips, trains, supervises and engages with residents is executive. Neither task belongs to the judiciary.

### B. By Granting Local Legislative and Executive Powers to the Monitor, the Court Violates the Constitution

Article III vests federal courts only with "[t]he judicial Power." U.S. Const. art. III, § 1. The Constitution does not give the courts the legislative or executive powers, let alone local versions of such powers. As early as 1792 in *Hayburn's Case*,

2 U.S. (2 Dall.) 408 (1792), federal courts have exercised restraint when asked to perform functions outside the judicial power vested in them. *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 677-78 (1988) ("As a general rule, we have broadly stated that 'executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution.'" (citation omitted)); *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113-14 (1948) (refusing to provide "advisory opinions even when asked by the Chief Executive").

Because a federal district court possesses no legislative or executive powers, federal or local, it cannot exercise such powers, and it cannot bestow such powers upon the Monitor.

Even if (mistakenly) it were thought that the district court could properly grant local legislative and executive powers, it cannot give these powers, which are meant to be exercised by elected officials, to private parties. Transferring public regulatory power to private persons is "legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (striking down law which delegated to coal producers the power to set maximum labor hours of coal miners). "When it comes to private entities . . . there is not even a fig leaf of constitutional justification." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 62

(2015) (Alito, J., concurring) (opining that it was unconstitutional to assign "'binding' tie-breaking authority to a private arbitrator to resolve a dispute between Amtrak and the FRA").

The Supreme Court most recently addressed private delegation in *FCC v. Consumers' Research*, 606 U.S. 656, 692-93 (2025). It upheld the arrangement there because the private administrator acted in a purely advisory, subordinate role and the agency retained final decision-making authority. *Id*. Here, in contrast, the court-appointed Monitor is not subordinate to any accountable *executive* official. The Monitor's grades and assessment schedules, as the district court applies them, determine when the City of Cleveland may exit the Decree. And the Monitor is, by the Cleveland Decree's own terms, insulated from public-records law and third-party suits. The district court has thus given the Monitor a power that it cannot exercise itself—and insulation from accountability that public officials could never enjoy.

The role of a private monitor cannot be saved by pointing to Fed. R. Civ. P. 53, which permits appointment of special masters only for defined tasks. Rule 53 requires an order specifying special masters' duties and further requires *de novo* review of their factual findings and legal conclusions on objection. Fed. R. Civ. P. 53(a)(1), (b)(2), (f)(3)–(4). *See Cobell v. Norton*, 334 F.3d 1128, 1143 (D.C. Cir. 2003) (vacating appointment of monitor with wide-ranging investigative powers that went beyond Rule 53 and the court's inherent authority). But a monitor with a

decade-long mandate to audit, grade, approve, and recommend the reform of a municipal agency does not merely aid adjudication. The Monitor for the Cleveland Decree has been established as an unaccountable local police supervisor, unlawfully exercising legislative and executive power.

## IV. The Decree Violates the Supremacy Clause by Displacing State and Local Law with an Instrument that Is Not Federal Law

The Supreme Court has recognized that consent decrees, particularly institutional reform decrees such as the Cleveland Decree, "often raise sensitive federalism concerns." *Horne*, 557 U.S. at 448. This concern is heightened where, as here, "public officials . . . consent to . . . decrees that go well beyond what is required by federal law." *Id.*

The Supremacy Clause makes supreme "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof," and ratified treaties. U.S. Const. art. VI, cl. 2. This clause is "not an independent grant of legislative power" but a "rule of decision" holding that federal law trumps state law where there is a conflict. *Murphy v. NCAA*, 584 U.S. 453, 477 (2018) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015)). Accordingly, when a consent decree imposes duties beyond what federal law requires, a court cannot rely on it to displace or preempt state or municipal law.

The Supreme Court has noted that "important considerations of federalism" should be weighed when a federal court is exerting its equitable powers to impose

injunctive relief on state and municipal agencies. *Rizzo v. Goode*, 423 U.S. 362, 378 (1976). Thus, where "the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Id.* (quoting *Stefanelli v. Minard*, 342 U.S. 117, 120 (1951)). In *Rizzo*, the Supreme Court found that the district court's injunctive order, which "significantly revis[ed] the internal procedures of the Philadelphia police department, was indisputably a sharp limitation on the department's 'latitude in the "dispatch of its own internal affairs"'" and required that "appropriate consideration … be given to principles of federalism." *Id.* at 379 (quoting *Cafeteria & Rest. Workers Union Loc. 473 A.F.L.-C.I.O. v. McElroy*, 367 U.S. 886, 896 (1961)).

It does not matter that Cleveland officials consented, at one time, to the terms of the Decree:

> The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals.

*New York v. United States*, 505 U.S. 144, 181 (1992). Principles of federalism do not exist merely to protect states or municipalities, but more fundamentally to secure the people's liberties and their right to self-government.

## CONCLUSION

The district court's order should be reversed and the case remanded with instructions to terminate the Cleveland Decree immediately. In doing so, the Court should recognize that Articles I and III, as well as the Supremacy Clause, compel that constitutional result.

Dated: November 6, 2026

Respectfully submitted,

/s/ *Margot Cleveland*

Margot Cleveland
*Counsel of Record*
Caitlin M. Moyna
Margaret A. Little
Markham S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
(202) 869-5210
margot.cleveland@ncla.legal
caitlin.moyna@ncla.legal

*Counsel for* Amicus Curiae
*New Civil Liberties Alliance*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b), this brief contains 6,406 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: November 6, 2026

/s/ *Margot Cleveland*
*Counsel for* Amicus Curiae
*New Civil Liberties Alliance*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: November 6, 2026

/s/ *Margot Cleveland*
*Counsel for* Amicus Curiae
*New Civil Liberties Alliance*